# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**KEMUEL GODOY-GUZMAN,**

    **Plaintiff,**

    **v.**

**UNIFIED GOVERNMENT OF WYANDOTTE
COUNTY AND KANSAS CITY, KANSAS,**

    **Defendant.**

**Case No. 2:17-cv-02660-HLT**

## MEMORANDUM AND ORDER

Plaintiff Kemuel Godoy-Guzman brings this action against his former employer, Defendant Unified Government of Wyandotte County and Kansas City, Kansas, alleging disparate treatment, hostile work environment, retaliation, and retaliatory harassment[1] in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, et seq. Defendant moves for summary judgment on all claims. Doc. 43. For the following reasons, the Court denies Defendant's request for summary judgment on Plaintiff's claims for retaliation—to the extent that claim is premised on Plaintiff's termination—and retaliatory harassment. But the Court grants Defendant's request for summary judgment on Plaintiff's disparate treatment and hostile work environment claims, and on his claim for retaliation on all other bases.

---

[1] Although there is some confusion regarding whether retaliatory harassment is a theory of retaliation or an entirely separate claim, the Court treats it as a separate claim in this case and notes that other courts in this District have previously recognized retaliatory harassment claims. *See, e.g.*, *Turrentine v. United Parcel Serv., Inc.*, 645 F. Supp. 2d 976, 986 (D. Kan. 2009); *Haney v. Preston*, 2010 WL 5392670, at *12 (D. Kan. 2010); *Adcox v. Brennan*, 2017 WL 2405326, at *6 (D. Kan. 2017).

## I. BACKGROUND[2]

### A. Plaintiff's Employment History

In October 2013, Defendant—a municipality located in Wyandotte County, Kansas City, Kansas—hired Plaintiff as a Fleet Maintenance Worker in its Public Works/Fleet Services Division. Doc. 30 at 2 ¶¶ 1, 3-4. Two months later, Plaintiff was elevated to the position of Fleet Maintenance Technician I. *Id.* at 2 ¶ 5. During his employment with Defendant, Plaintiff was responsible for performing preventative maintenance on and repairing Defendant's vehicles, including vehicles used by Defendant's Police Department and Sheriff's Department. Doc. 44 at 5 ¶ 13.

### B. September 2015 Harassment Complaint

Beginning in 2015, Plaintiff—who is Hispanic and was born in Mexico (Doc. 30 at 2 ¶ 2)— was subjected to a number of derogatory race- and national-origin-based remarks by his coworkers. The comments were principally made by Patrick Garrett (initially a Fleet Maintenance Technician II, and then, as of August 27, 2015, Lead Fleet Maintenance Technician), Rita Adams (Clerk II), Steve Stratton (Fleet Maintenance Technician II), and Shawn Vanderwerf (Fleet Maintenance Technician II). Doc. 44 at 10 ¶ 29. The uncontroverted evidence establishes the following comments:

- When Plaintiff spoke English, Plaintiff's coworkers made fun of his accent and told him to "speak English" (even though he was). *Id.* at 10 ¶ 30.

- When a dispatcher announced crimes such as auto theft over the police radio (which the fleet services employees could hear in the police vehicles they were servicing), Garrett commented to Plaintiff that the thieves were his "cousins." *Id.*

- After Garrett's truck was stolen, Garrett commented to Plaintiff that Garrett knew Plaintiff's cousins did it and that Garrett's truck was "probably in Mexico by now." *Id.*

---

[2]   For purposes of summary judgment, the following facts are uncontroverted or recited in the light most favorable to Plaintiff as the nonmoving party.

- Plaintiff's coworkers called him "KG" instead of his full name because they had difficulty pronouncing it. *Id.*

- When Plaintiff spoke to his family members on the phone in Spanish, Stratton told Plaintiff to "speak English, this is America." *Id.*

- When Plaintiff played Mexican music in the shop his coworkers told him to turn it off, but when other genres of music were played, no one was told to turn off the music. *Id.*

- Garrett and Stratton asked Plaintiff if he was related to Mexican drug cartel leader El Chapo. *Id.*

- Garrett told Plaintiff that he looked too "Mexican" without his glasses and that Garrett did not like that. Doc. 52 at 10 ¶ 24.

- Garrett alleged Plaintiff was going to Texas to buy or sell cocaine. *Id.* at 10 ¶ 28.

- After Plaintiff injured his back at work, Vanderwerf accused Plaintiff of faking the injury and "putting down" his Mexican race because Mexicans were supposed to be hard workers. *Id.* at 10 ¶ 30.

- When Plaintiff showed photos of his baby, who is light-skinned, Vanderwerf asked Plaintiff if he was sure the baby was his and told him he should get a DNA test. Doc. 44 at 10 ¶ 30. This prompted Plaintiff to stop showing pictures of his children to his coworkers. Doc. 52 at 10 ¶ 23.

This conduct culminated in an incident on September 9, 2015 involving Adams and Garrett. Doc. 44 at 11 ¶ 31. At lunch, Adams, apparently incensed that her food order from a Mexican restaurant was incorrect, complained: "Motherfuckers couldn't get my order right. Bitches. That's why I hate those fucking wetbacks. They need to go back to their fucking country." *Id.* Noticing Plaintiff—who was also sitting and eating his lunch—Adams continued: "No offense, but I fucking hate them." *Id.* Garrett subsequently walked in and Plaintiff told Garrett about Adams's comment. *Id.* In response, Garrett took an unopened bottle of water that was sitting on a table, began opening it, and stated, "Hey KG. Turn around and let me pour this down your back." *Id.* When Plaintiff asked what Garrett meant, Garrett claimed he was joking. *Id.*

That same day, Plaintiff called Defendant's Human Resources Department ("HR") to report that he had been subject to unwanted comments and treatment by some of his coworkers. *Id.* at 10 ¶ 27. Plaintiff discussed his complaint with Renee Ramirez (HR Director) and Shakeva Christian (HR Manager) on the phone two days later. *Id.* at 10 ¶ 29. During the call, Plaintiff told Ramirez and Christian that several employees—including Garrett, Adams, Stratton, and Vanderwerf—had made jokes and remarks regarding his race or national origin. *Id.*

Ramirez and Christian investigated Plaintiff's complaints and, at the conclusion of the investigation, recommended that Garrett, Adams, and Stratton be disciplined for violation of Defendant's Harassment in the Workplace policy.[3] *Id.* at 14 ¶¶ 45-46. Merle McCullough—who, as Fleet Services Supervisor, was in charge of the Fleet Services Division (*Id.* at 4 ¶ 6)—followed their advice and issued the recommended discipline. *Id.* at 15 ¶ 47. Stratton was issued a written warning, Adams was suspended without pay for one day, and Garrett was suspended without pay for five days. *Id.* at 14 ¶ 46. All three employees were also required to attend training aimed at preventing workplace harassment. *Id.*

Following Plaintiff's harassment complaint and the resultant discipline, Plaintiff's coworkers no longer made jokes or comments about his race or national origin. *Id.* at 15 ¶ 53. Indeed, Plaintiff felt that Garrett, Adams, and Stratton limited or avoided interacting with him. *Id.* at 15 ¶ 51. But, although his coworkers no longer made such remarks, they made other comments regarding Plaintiff's complaint to HR. *Id.* at 15 ¶ 53. For example, Lawrence "Bubba" Harvey made comments such as "watch out what you're saying because KG is here, he might go to Human Resources and report" and "I don't care if you report me or not." *Id.* Other comments by Plaintiff's coworkers included: "Don't say nothing because we have a crybaby here"; "Somebody is going to

---

[3]    Vanderwerf was not issued any discipline for his comments. Doc. 52 at 14 ¶ 58.

go to Human Resources"; "That didn't offend you, did it?"; and "Did I say something wrong?" *Id.* Plaintiff did not report these comments to HR because he did not want to look like he would go to HR "every time for any little thing" and, because the race- and national-origin-based comments had stopped, he thought he could handle "the other stuff." *Id.* at 16 ¶ 54.

Plaintiff also claims that, following his complaint to HR, he received harder and more complicated work. Plaintiff alleges that Vanderwerf would leave the harder repairs for him so that, if the repairs took a long time or didn't get done, Plaintiff would look bad. *Id.* at 17 ¶ 61. Plaintiff also alleges that Garrett—who, as Lead Fleet Maintenance Technician, had the ability to assign work-related tasks to other technicians (*Id.* at 13 ¶ 40)—gave him the hardest and most complicated work. *Id.* at 18 ¶ 64.

### C.    Plaintiff's Discipline and Retaliation Complaint

Around this time, in late 2015, Plaintiff applied for a promotion and, effective November 5, 2015, was elevated to the position of Fleet Maintenance Technician II. Doc. 30 at 3 ¶ 10; Doc. 52 at 15 ¶ 68. McCullough opposed Plaintiff's promotion because he had concerns about Plaintiff's work performance—even though Plaintiff had not been issued any discipline for poor work, or any other reason, in 2015. Doc. 44 at 16 ¶ 56; Doc. 52 at 15 ¶ 69. Because Plaintiff was the highest seniority applicant, he was ultimately awarded the position. Doc. 44 at 16 ¶ 56. Shortly after Plaintiff was promoted, McCullough assigned Plaintiff to repair a bus that other mechanics had been unable to fix. *Id.* at 18 ¶ 66. When Plaintiff was likewise unable to get the bus in working order, McCullough threatened to demote him. *Id.* Plaintiff told McCullough that if he was demoted, he would fight it; ultimately, McCullough did not demote Plaintiff. *Id.*

On January 29, 2016, Plaintiff was issued a written warning for incompetency in performing his duties and insubordination after he failed to charge or sign out parts several days

prior. Doc. 30 at 3 ¶ 11. Plaintiff had ordered two headlights and, when he ended up not using them, left them on the parts window but did not tell anyone that they needed to be returned and did not put notes in the work order about what he had done. Doc. 44 at 19 ¶ 67. After he received the discipline, Plaintiff told McCullough that no one had trained him in the proper procedure. Doc. 52 at 16 ¶ 73. Plaintiff's union ultimately filed a grievance on his behalf over the discipline, arguing Plaintiff should have been issued a verbal, rather than a written, warning. Doc. 44 at 20 ¶ 69. Indeed, Defendant maintains a progressive discipline policy, which provides that discipline starts with a verbal warning and progresses to a written warning, suspension, and then termination (although progressive discipline may be disregarded in cases involving serious misconduct or a major violation of policy or law). *Id.* at 5 ¶ 14. Eventually, the discipline was in fact reduced to a verbal warning. *Id.* at 20 ¶ 69.

On May 10, 2016, McCullough gave Plaintiff a two-day[4] suspension for careless workmanship after he installed the wrong tire on a vehicle. *Id.* at 20 ¶ 70; Doc. 52 at 16 ¶ 75. Plaintiff admitted he had installed a tire with the wrong sensor on it, but he maintained that he pulled the wrong tire because he was unaware of the shop's new system for organizing tires, which had been changed without informing him. Doc. 44 at 20 ¶ 70; Doc. 52 at 16 ¶ 76. Tony Riley— who, as Assistant Fleet Administrator, supervised the garage—told Plaintiff he would only receive a verbal warning for the incident. Doc. 44 at 4 ¶ 8; Doc. 52 at 16 ¶ 77. But McCullough overrode Riley's decision and attempted to impose the suspension. Doc. 52 at 16 ¶ 78. Plaintiff once again contacted his union and, the same day, McCullough reversed the discipline. Doc. 44 at 20 ¶ 70; Doc. 52 at 16 ¶ 79.

---

[4]    For purposes of clarity, the Court notes that, in the pretrial order, the parties stipulate that Plaintiff was given a three-day suspension for this incident. Doc. 30 at 3 ¶ 12. But both Defendant's (Doc. 44 at 20 ¶ 70) and Plaintiff's (Doc. 52 at 16 ¶ 75) summary judgment briefing states that the suspension was only two days, and both of these facts are uncontroverted by the opposing party.

Two days later, on May 12, 2016, Plaintiff made a second complaint to HR, alleging that McCullough was retaliating against him for his earlier harassment complaint. Doc. 30 at 3 ¶ 13. In an interview with HR—again, Ramirez and Christian—Plaintiff complained about the May 10 discipline for installing the wrong tire and alleged that other employees, including Garrett, were not disciplined for their mistakes. Doc. 44 at 20 ¶ 72. Plaintiff also referenced the earlier incident with the bus repair. *Id.*

On May 27, 2016, Plaintiff was issued a written warning for substandard work after he failed to attach the battery connector to an alternator he installed. *Id.* at 21 ¶ 73. The problem, which was discovered by another fleet maintenance technician, "caused the connector to short out on the intake, damaging the intake and the wire connector." *Id.* at 21 ¶¶ 73-74. Following this latest discipline, Plaintiff emailed Ramirez stating that he had received another corrective action. *Id.* at 21 ¶ 77.

In August 2016, approximately three months after Plaintiff made his retaliation complaint, HR personnel interviewed McCullough regarding the complaint. *Id.* at 21 ¶ 78. By late October 2016—more than five months after Plaintiff made the complaint—Defendant's investigation was still open. Doc. 52 at 17 ¶ 87. It is unclear whether Defendant ever completed its investigation of Plaintiff's retaliation complaint. *Id.* at 18 ¶ 88.

**D.     Plaintiff's Termination**

In late 2016, after McCullough received complaints from Plaintiff's coworkers—stating, for example, that Plaintiff disappeared during his shift and could not be found (Doc. 44 at 29 ¶ 107)—he decided to investigate Plaintiff. Doc. 52 at 18 ¶ 91. McCullough researched GPS records for the shop truck and compared them to records of Plaintiff's time and found that, on 19 occasions in November and December 2016, Plaintiff drove the shop truck to various addresses

while logged in and supposedly working and stopped for 30 minutes to an hour. Doc. 44 at 29 ¶ 107. On most of these occasions, Plaintiff also later logged out and took a lunch break. *Id.* These records indicated that Plaintiff was leaving work while still on the clock, going somewhere to visit somebody for half an hour or an hour, then coming back to the shop and taking lunch. *Id.* at 30 ¶ 109.

There were also several specific incidents in December 2016 and January 2017 involving Plaintiff. On December 10, 2016, Plaintiff admittedly worked on his personal vehicle in the fleet services garage while clocked in for work, even though he indicated on the work log that he was repairing one of Defendant's vehicles during the time his truck was in the garage. *Id.* at 25-26 ¶¶ 86, 88. And, on December 18, 2016, Plaintiff drove a Sheriff's Department vehicle that had been brought in for maintenance without permission. Doc. 30 at 3 ¶ 15. While he was driving, the front windshield of the vehicle became fogged over, so Plaintiff stopped the vehicle and turned on the emergency equipment (the flashing lights). *Id.* at 3 ¶ 16. Plaintiff then drove the vehicle to a Cabela's store where he picked up his girlfriend and drove her to his home. *Id.* at 3 ¶ 17. Plaintiff then returned to the garage. Doc. 44 at 27 ¶ 95. Plaintiff alleges he turned on the emergency lights because of the weather and that he had to pick up his girlfriend because she was pregnant and experiencing difficulties while at work. Doc. 52 at 20 ¶ 109. But Plaintiff did not call his supervisor to ask permission to use the vehicle to pick up his girlfriend and take her home, nor did Plaintiff leave any record that he had taken the vehicle on a drive or even that he had worked on the vehicle. Doc. 44 at 27 ¶¶ 96, 98. Indeed, Plaintiff was logged in as working on another vehicle during the trip. *Id.* at 27 ¶ 97. McCullough learned about this incident after a colonel in the Sheriff's Department viewed footage from the vehicle's in-car video camera and notified him about what had occurred. *Id.* at 28 ¶ 100. Defendant's policies generally prohibit fleet services employees

from having "outside riders" in Defendant's vehicles. *Id.* at 28 ¶ 101. The video footage also revealed that Plaintiff had been texting while driving the vehicle, which is also a violation of policy. *Id.* at 28 ¶¶ 102-103.

On January 6, 2017, McCullough received an email from a captain with the Police Department complaining about a delay in service the previous evening; officers had requested assistance with a patrol car that wouldn't start, but, over an hour after the request was made, had not received a response from fleet services. *Id.* at 28 ¶ 104. Records later revealed that Plaintiff had left to get lunch and, on his outing, also made three personal stops. *Id.* at 28 ¶ 105. As a result, Plaintiff was absent from the garage for nearly an hour and a half—which was twice the time allotted for lunch. *Id.* at 28-29 ¶¶ 105-106.

On January 10, 2017, McCullough sent a memorandum to Michael Tobin (Deputy Director of Public Works) recommending that Plaintiff be terminated. *Id.* at 30 ¶ 110. The recommendation was ultimately approved by Joe Connor (Assistant County Administrator) with input from HR. *Id.* at 31 ¶¶ 111-113. McCullough called Plaintiff into his office the next day and told him he was suspended pending termination. Doc. 30 at 4 ¶ 19. Tobin subsequently advised Plaintiff of the basis for this discipline. In a letter dated January 18, 2017, Tobin wrote that Plaintiff had been suspended pending termination "due to various policy and operational violations," including: leaving his assigned job or work area without permission on several occasions; deliberately reducing work effort or production; falsifying work logs; using a Sheriff's Department vehicle, including the emergency equipment, without authorization; allowing an unauthorized person to ride in the Sheriff's Department vehicle; texting while driving the Sheriff's Department vehicle; taking more than the specified time for lunch or break periods; and dishonesty. *Id.* at 4 ¶ 20. Plaintiff had never been written up for any of these violations and Defendant admittedly did not

follow its progressive discipline policy in this instance. Doc. 52 at 19 ¶¶ 102-103. And, although Defendant's policy is to have a one-on-one meeting with an employee when a violation occurs, Plaintiff did not meet with anyone prior to his termination. *Id.* at 19 ¶¶ 104-105. Plaintiff's employment was ultimately terminated effective January 11, 2017. Doc. 30 at 4 ¶ 21.

Approximately three months later, on April 4, 2017, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). *Id.* at 4 ¶ 22. The U.S. Department of Justice subsequently issued Plaintiff a notice-of-right-to-sue letter on August 28, 2017. *Id.* at 4 ¶ 23. Plaintiff proceeded to file this action against Defendant on November 21, 2017, asserting claims pursuant to Title VII. Docs. 1, 30. Defendant moves for summary judgment on each claim. Doc. 43.

## II.     STANDARD

Summary judgment is appropriate where the moving party demonstrates that "there is no genuine dispute as to any material fact" and it is "entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In applying this standard, courts must view the facts and any reasonable inferences that might be drawn therefrom in the light most favorable to the non-moving party. *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994). "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III.    ANALYSIS

As set forth above, Plaintiff brings this action pursuant to Title VII, which—pertinent to Plaintiff's claims—forbids employment discrimination on the basis of race or national origin. *See*

*Chavez v. New Mexico*, 397 F.3d 826, 831 (10th Cir. 2005). Plaintiff asserts claims for (1) disparate treatment, (2) hostile work environment, (3) retaliation, and (4) retaliatory harassment. Doc. 30. The Court addresses each claim in turn.

### A.       Disparate Treatment

The Court first addresses Plaintiff's disparate treatment claim. Defendant argues it is entitled to summary judgment on this claim for a multitude of reasons. But Plaintiff's opposition brief fails to respond to Defendant's arguments in favor of summary judgment on this claim. Plaintiff's failure to respond is basis for summary judgment. *See, e.g.*, *Hinsdale v. City of Liberal, Kan.*, 19 F. App'x 749, 768-69 (10th Cir. 2001) (affirming district court's ruling that plaintiff abandoned claim by failing to address it in response to motion for summary judgment); *Maestas v. Segura*, 416 F.3d 1182, 1190 n.9 (10th Cir. 2005) (finding plaintiffs abandoned claims by failing to "seriously address them" in their appellate brief); *Loudon v. K.C. Rehab. Hosp.*, Inc., 339 F. Supp. 3d 1231, 1242 (D. Kan. 2018). Therefore, given Plaintiff's lack of response—and as Defendant argues in its reply (Doc. 57 at 3)—the Court concludes that Plaintiff abandoned his Title VII disparate treatment claim, and, accordingly, grants Defendant's motion for summary judgment as it pertains to this claim.

### B.       Hostile Work Environment

The Court next addresses Plaintiff's claim for hostile work environment. Plaintiff alleges he was subjected to a hostile work environment when his coworkers made remarks regarding his race (Hispanic) and national origin (Mexican). In support of its motion for summary judgment, Defendant argues: (1) Plaintiff failed to timely exhaust his administrative remedies with respect to this claim;[5] (2) Plaintiff cannot establish his prima facie case because the harassment was not so

---

[5]     In his summary judgment briefing, Plaintiff argues that Defendant has waived its defense of failure to timely exhaust by not raising the defense in a motion to dismiss and, further, that Defendant fails to adequately plead the

"severe or pervasive" so as to alter a term or condition of his employment; and (3) Defendant cannot be held vicariously or directly liable for any harassment. Doc. 44 at 34-35.

For the following reasons, the Court agrees that Plaintiff's hostile work environment claim is untimely. Under Title VII, a plaintiff must file a charge of discrimination with the EEOC within 300 days of the alleged unlawful employment practice before filing a lawsuit in federal court. *Payan v. United Parcel Serv.*, 905 F.3d 1162, 1169 n.1 (10th Cir. 2018). "A discrete retaliatory or discriminatory act 'occurred' on the day that it happened." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002). But "[a] hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice,'" and, therefore, "[i]n order for the charge to be timely, the employee need only file a charge within . . . 300 days of any act that is part of the hostile work environment." *Id.* at 117-18.

Here, Plaintiff filed his charge on April 4, 2017. Doc. 30 at 4 ¶ 22. Therefore, to be timely, Plaintiff must identify at least one act of harassment that occurred within 300 days preceding this date—in other words, he must identify incidents of race- or national-origin-based harassment that occurred on or after June 9, 2016. Plaintiff's hostile work environment claim is entirely premised on the comments made by his coworkers regarding his race and national origin. Indeed, in his summary judgment briefing, Plaintiff asserts that he "faced a hostile work environment" because

---

defense. These arguments are unpersuasive for several reasons. First, failure to exhaust is not always amenable to a motion to dismiss because it is a defense and depends upon the facts of the claim, which are not always clear from the face of the pleadings. Second, for similar reasons, Defendant was not required to raise this in a motion to dismiss. Third, Defendant asserted this defense it its answer. *See* Doc. 5 ¶ 66 (asserting that "Plaintiff has failed to exhaust or to timely exhaust administrative remedies"). Plaintiff took no action at that time—he did not file a motion to strike or any other motion challenging the sufficiency of this defense. Fourth, and finally, Defendant again asserted this defense in the pretrial order (*see* Doc. 30 at 12), which supersedes all pleadings and controls the course of this action. *See* FED. R. CIV. P. 16(d); D. KAN. R. 16.2(b). Again, Plaintiff neither opposed the inclusion of this defense in the pretrial order nor took any other action—until this point—to raise these arguments with the Court. For these reasons, the Court finds that Defendant asserted this defense from the earliest stages of this case, that Plaintiff never objected to its inclusion until summary judgment briefing, and that Plaintiff has not identified any meaningful prejudice to him by Defendant arguing this defense at the summary judgment stage.

"[his] supervisor and co-workers subjected him to relentless derogatory racist comments for months." Doc. 52 at 1. But all of the derogatory race- and national-origin-based remarks by Plaintiff's coworkers that Plaintiff identifies in this case—specifically, the comments by Garrett, Adams, Stratton, and Vanderwerf—occurred in 2015 after Plaintiff was moved to the day shift. *Id.* at 9 ¶ 20. Plaintiff admits that, following his complaint and the discipline issued to Garrett, Adams, and Stratton, his coworkers no longer made jokes or comments about his race or national origin. Doc. 44 at 15 ¶ 53. All of the instances of alleged harassment related to Plaintiff's protected class therefore occurred well beyond the 300-day time limit and, as such, Plaintiff fails to identify any timely instances of race- or national-origin-based harassment.

In his opposition, Plaintiff argues his claim is timely because the harassment was ongoing and did not end after he reported the conduct. Although, again, Plaintiff admits he was not subject to any more derogatory race- or national-origin-based remarks following his complaint, he nonetheless claims the harassment did not end—rather, the "content and character" of that harassment simply changed. Doc. 52 at 48. Plaintiff's coworkers began avoiding him and limiting their interactions with him. Doc. 44 at 15 ¶ 51. And they made comments regarding Plaintiff's complaint to HR, implying that Plaintiff was easily offended, a complainer, or a "crybaby." *Id.* at 15 ¶ 53. Plaintiff also claims that, following his complaint to HR, he received harder and more complicated work in an effort to make him "look bad." *Id.* at 17-18 ¶¶ 61, 64. But to establish a prima facie case of hostile work environment under Title VII, a plaintiff must prove that the harassment was based on a protected class. *Payan*, 905 F.3d at 1170.[6] Put differently, a plaintiff

---

[6]    To establish a prima facie case of Title VII hostile work environment, a plaintiff must show: (1) he is a member of a protected group; (2) he was subject to unwelcome harassment; (3) the harassment was based on the plaintiff's membership in that protected group; and (4) due to the harassment's severity or pervasiveness, the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment. *Payan*, 905 F.3d at 1170.

cannot have a cause of action under Title VII for a hostile work environment that is not tied to his protected class. The conduct complained of by Plaintiff at this point was no longer related to his race or national origin. Plaintiff states in his opposition brief that "[r]ather than us[ing] racially pejorative comments, his harassers shifted to mocking him verbally for reporting in the first place." Doc. 52 at 33-34. But Plaintiff fails to explain or offer any authority regarding how pejorative comments not tied to his protected class constitute a hostile work environment under Title VII. Indeed, in making this argument, it seems Plaintiff is conflating his hostile work environment claim with his retaliatory harassment claim; the conduct that occurred after the discipline appears to have been tied to Plaintiff's protected activity, not his protected class.

For these reasons, Plaintiff's allegations of race- or national-origin-based harassment are untimely, and the Court accordingly grants summary judgment in Defendant's favor on Plaintiff's Title VII hostile work environment claim.[7]

## C.     Retaliation

The Court next addresses Plaintiff's claim for retaliation. In this case, Plaintiff claims Defendant retaliated against him after he complained of race-based harassment in September 2015. Plaintiff appears to assert five separate adverse actions that he claims constitute retaliation occasioned by his harassment complaint: (1) McCullough's threat to demote Plaintiff (for failing to fix a bus); (2) discipline issued by McCullough on January 29, 2016 (related to Plaintiff's failure to charge or sign out parts); (3) discipline issued by McCullough on May 10, 2016 (after Plaintiff installed the wrong tire on a vehicle); (4) discipline issued May 27, 2016 (after Plaintiff failed to attach the battery connector to an alternator he installed); and (5) Plaintiff's termination.[8]

---

[7]     Because the Court finds that Plaintiff's hostile work environment claim is untimely, the Court does not reach the merits of Defendant's other arguments in favor of summary judgment on this claim.

[8]     In its briefing, Defendant argues that, to the extent Plaintiff also bases his retaliation claim on Defendant's refusal to pay Plaintiff overtime pay in September 2016, this theory was waived when it was not included in the pretrial

Defendant argues for summary judgment on several bases. Specifically, Defendant argues: (1) to the extent Plaintiff premises his claim on the threat of demotion or the January 29, May 10, or May 27, 2016 disciplinary actions, the claim is untimely; (2) none of these four incidents constitutes an "adverse action" for purposes of Plaintiff's prima facie case; (3) Plaintiff cannot establish that any of the alleged adverse actions (including his termination) were causally connected to his harassment complaint so as to satisfy the third element of his case; and (4) regardless, Plaintiff was terminated for legitimate, nonretaliatory reasons, and Plaintiff cannot show that those reasons were mere pretext. Doc. 44 at 55.

As an initial matter, the Court agrees with Defendant that four of Plaintiff's five theories of retaliation—i.e., the threat of demotion and the January 29, May 10, and May 27, 2016 disciplines—are untimely. *See Payan*, 905 F.3d at 1169 n.1 (stating that, under Title VII, a plaintiff must file a charge of discrimination with the EEOC within 300 days of the alleged unlawful employment practice before filing a lawsuit in federal court); *see also* Doc. 30 at 4 ¶ 22 (noting that Plaintiff's charge was filed April 4, 2017, meaning that, to be timely, Plaintiff must identify a retaliatory act occurring on or after June 9, 2016). Those actions therefore cannot serve as a basis for Plaintiff's retaliation claim. But the Court finds that there is a genuine issue of material fact with respect to Plaintiff's retaliation claim based on his termination.

Again, Defendant's arguments in favor of summary judgment on Plaintiff's claim for retaliation as it pertains to his termination appear to be that (1) Plaintiff cannot establish the requisite causal connection, and (2) even if he could, Defendant terminated Plaintiff for legitimate, nonretaliatory reasons, and Plaintiff therefore cannot establish that those reasons were mere

order. Based on the summary judgment briefing, the Court does not understand Plaintiff to be making this claim, but, regardless, because it was not included in the pretrial order, it is not a part of this case. *See* Fed. R. Civ. P. 16(d) (noting that the pretrial order "controls the course of the action"); D. Kan. R. 16.2(b) (same).

pretext. The Court disagrees and concludes that Plaintiff has come forward with sufficient evidence to justify an inference of retaliatory motive on the part of Defendant and sufficient evidence of pretext.

## 1. Causation

The Court first addresses Defendant's causation argument. Title VII retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting scheme.[9] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013) (applying burden-shifting analysis to Title VII retaliation claim). The first step of the *McDonnell Douglas* analysis requires the plaintiff to establish his prima facie case. *Tabor*, 703 F.3d at 1216. To establish a prima facie case of Title VII retaliation, the plaintiff must show that: (1) he engaged in protected opposition to discrimination, (2) a reasonable employee would have considered the challenged employment action materially adverse, and (3) a causal connection existed between the protected activity and the materially adverse action. *Payan*, 905 F.3d at 1172. Defendant does not appear to contest that Plaintiff's September 2015 complaint was protected activity sufficient to satisfy the first element of his case. Nor does Defendant apparently contest that Plaintiff's termination was a materially adverse employment action sufficient to satisfy the second element. But, again, Defendant argues Plaintiff cannot establish the requisite causal connection.

The Court disagrees. The evidence reveals that, within two months of Plaintiff's September 2015 harassment complaint, Plaintiff's supervisor, McCullough, opposed his promotion due to concerns about Plaintiff's work performance—even though Plaintiff had not

---

[9] The Court notes that *McDonnell Douglas*'s burden-shifting scheme applies only where evidence is circumstantial, rather than direct. *See Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013). Here, neither party appears to dispute the applicability of the *McDonnell Douglas* framework to Plaintiff's retaliation claim and, regardless, the Court finds that Plaintiff has not presented any direct evidence of retaliation so as to justify deviating from that framework.

been issued any discipline for poor work, or for any other reason, in 2015. Doc. 44 at 16 ¶ 56; Doc. 52 at 15 ¶ 69. The record reflects that, from this point, Plaintiff was subjected to multiple instances of unwarranted discipline by McCullough; for example, being written up even when it was not the proper step in Defendant's progressive discipline policy. This culminated in the investigation into Plaintiff's performance—which Defendant admits no other employee had been subject to within the last five years (Doc. 52 at 18 ¶ 93)—that ultimately resulted in Plaintiff's termination. It is reasonable to infer, therefore, that McCullough may have been looking for reasons to terminate Plaintiff's employment. The evidence, although perhaps not overwhelming, is sufficient to permit a reasonable jury to find the requisite causal connection between Plaintiff's protected activity and his termination. And the Court notes that Plaintiff's burden at the prima facie stage "is not onerous"—only a minimal showing is necessary. *See Tabor*, 703 F.3d at 1216; *Bauer v. Albemarle Corp.*, 169 F.3d 962, 967 (1999).

## 2. Pretext

The Court next addresses Defendant's argument that it is entitled to summary judgment because Plaintiff cannot establish pretext. Under *McDonnell Douglas*, once a plaintiff establishes his prima facie case, the burden shifts to the defendant to articulate a legitimate, nonretaliatory reason for its adverse action. *Tabor*, 703 F.3d at 1216-17. Assuming the defendant satisfies this step, the plaintiff avoids summary judgment only by showing that the defendant's proffered reason for its conduct was mere pretext. *Id.* at 1217. A plaintiff can demonstrate pretext by identifying "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997). A plaintiff typically establishes pretext in one of three ways: (1) evidence that the defendant's stated

reason for its adverse action was false; (2) evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances; or (3) evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff. *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000). "Mere conjecture that the employer's explanation is pretext is insufficient to defeat summary judgment." *Myers v. Colgate-Palmolive Co.*, 102 F. Supp. 2d 1208, 1217 (D. Kan. 2000).

According to Defendant, it terminated Plaintiff's employment due to "various policy and operational violations," including: leaving his assigned job or work area without permission on several occasions; deliberately reducing work effort or production; falsifying work logs; using a Sheriff's Department vehicle, including the emergency equipment, without authorization; allowing an unauthorized person to ride in the Sheriff's Department vehicle; texting while driving the Sheriff's Department vehicle; taking more than the specified time for lunch or break periods; and dishonesty. Doc. 30 at 4 ¶ 20. But the Court finds that the evidence is sufficient for a reasonable jury to conclude that the stated reasons for Plaintiff's termination were pretext for retaliation.

First, the evidence reflects a genuine issue of fact regarding whether Defendant followed its disciplinary policy in its termination of Plaintiff. Defendant maintains a progressive discipline policy, which provides that discipline starts with a verbal warning and progresses to a written warning, suspension, and then termination. Doc. 44 at 5 ¶ 14. Plaintiff had never been written up for any of the violations for which he was ultimately terminated. Doc. 52 at 19 ¶ 103. Defendant admits, therefore, that it did not follow its progressive discipline policy in this instance. *Id.* at 19 ¶ 102. And, although progressive discipline may be disregarded in cases involving serious misconduct or a major violation of policy or law (Doc. 44 at 5 ¶ 14), there were other abnormalities

in the way in which Plaintiff's termination was handled. For example, Defendant's policy is to have a one-on-one meeting with an employee when a violation occurs. Doc. 52 at 19 ¶ 105. Yet Plaintiff was not afforded a one-on-one meeting prior to his termination, nor was he otherwise allowed to respond to or explain the allegations against him before he was fired. *Id.* at 19 ¶¶ 104-105.

Second, the evidence establishes irregularities in the manner in which the complaints regarding Plaintiff's performance (which ultimately led to his termination) were investigated. Indeed, McCullough, who was investigating the complaints—and who initially recommended that Plaintiff be terminated (Doc. 44 at 30 ¶ 110)—was the subject of a retaliation complaint made by Plaintiff to HR in May 2016. Doc. 44 at 20 ¶ 72; Doc. 52 at 17 ¶ 85. Defendant admits it is not normal for a person accused of retaliation to conduct an investigation leading to the termination of the victim of the alleged retaliation. Doc. 52 at 19 ¶ 97. There is also no evidence that the retaliation investigation was ever completed, despite Defendant's policy that any retaliation investigation be completed quickly. *Id.* at 18 ¶¶ 88-89. Defendant admits that it violated this policy by not completing the investigation into the alleged retaliation by McCullough. *Id.* at 18 ¶ 90. Based on this evidence, a reasonable jury could conclude that Defendant's stated reasons for Plaintiff's termination were pretext for retaliation.

In sum, viewing the evidence in the light most favorable to Plaintiff, he has established a genuinely disputed issue of fact regarding whether he was terminated in retaliation for his September 2015 harassment complaint sufficient to be entitled to have a jury decide the issue.

### D.    Retaliatory Harassment[10]

Finally, the Court turns to Plaintiff's claim for retaliatory harassment.[11] To establish a prima facie case of retaliatory harassment, a plaintiff must show: (1) he engaged in protected opposition to discrimination; (2) the defendant subjected him to conduct that might well have dissuaded a reasonable employee from making a charge of discrimination; and (3) a causal nexus exists between the plaintiff's opposition and the defendant's conduct. *Haney v. Preston*, 2010 WL 5392670, at *12 (D. Kan. 2010). Plaintiff ostensibly asserts that his coworkers, in retaliation for his September 2015 complaint, engaged in a campaign of harassment against him intended to punish him for that activity. Defendant argues for summary judgment on two bases: (1) that Plaintiff cannot show that a supervisor orchestrated, condoned, or encouraged the harassment; and (2) that the harassing conduct did not rise to the level of a materially adverse action. Doc. 44 at 62-64. For the following reasons, however, the Court finds that genuine issues of material fact preclude summary judgment on Plaintiff's claim that Defendant engaged in retaliatory harassment.

First, the Court addresses Defendant's argument that Plaintiff cannot show that a supervisor orchestrated, condoned, or encouraged the harassment. As Defendant argues, "an employer can only be liable for co-workers' retaliatory harassment where its supervisory or management

---

[10]    *See supra* note 1.

[11]    Although the pretrial order does not expressly identify a claim for "retaliatory harassment" (*see* Doc. 30 at 11), the Court concludes that such a claim has been articulated and preserved in this case. First, the retaliation claim identified by Plaintiff in the pretrial order does not limit the claim to just the discrete acts identified and discussed in Part III.C, above. In his factual contentions, Plaintiff alleges that, after he made his September 2015 complaint, "[Defendant's] employees began to retaliate against [him] by harassing him for reporting the harassment." Doc. 30 at 7. And Defendant's summary judgment briefing also treats this claim as having been asserted. Indeed, Defendant specifically identifies this claim and makes an argument in favor of summary judgment. Doc. 44 at 62-64. The Court therefore concludes that the pretrial order and summary judgment briefing reflect that Plaintiff intends to assert—and has asserted—a claim of retaliatory harassment based on the aggregate effect of the alleged actions taken against him. *See Turrentine*, 645 F. Supp. 2d at 986 (where retaliatory harassment claim was not expressly included in the pretrial order, nonetheless recognizing the claim because "the pretrial order, plaintiff's brief in opposition to the motion for summary judgment and the record evidence reflect that plaintiff intends to assert a claim of retaliatory harassment based on the aggregate effect of the actions taken against her").

personnel either (1) orchestrate the harassment or (2) know about the harassment and acquiesce in it in such a manner as to condone or encourage the co-workers' actions." *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1265 (10th Cir. 1998). But much of the retaliatory conduct alleged by Plaintiff—detailed above (in Part I) and below—involved his supervisor, McCullough. And there is a fact issue regarding whether McCullough or another supervisor knew about the harassing conduct. In its motion, Defendant points out that, following Plaintiff's September 2015 complaint, he did not report any more harassing comments to HR. But just because Plaintiff did not report the comments to HR does not establish that Plaintiff's supervisors were not aware of what was happening, especially given that McCullough was required to monitor the workplace in order to prevent harassment. Doc. 52 at 12 ¶ 38.

Second, the Court turns to Defendant's argument that the harassing conduct complained of here did not constitute a "materially adverse action." In its briefing, Defendant appears to contend that retaliatory harassment requires a showing of harassment that was "severe or pervasive" enough to create a hostile work environment under Title VII. Doc. 44 at 63. But, although it does not appear the Tenth Circuit has addressed this issue, courts in this District have held that—contrary to Defendant's assertion that the challenged conduct must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment"—the conduct "need only be sufficiently severe or pervasive to constitute a 'materially adverse' action." *Adcox v. Brennan*, 2017 WL 2405326, at *7 (D. Kan. 2017). That is, a plaintiff claiming retaliatory harassment need only show conduct that, taken together, might dissuade a reasonable person from engaging in protected activity. *Id.*; *see also Haney*, 2010 WL 5392670, at *12.

The Court finds that Plaintiff has met that burden here. As previously discussed, and as detailed in Part I, Plaintiff cites a series of hostile events that he claims were in retaliation for his September 2015 harassment complaint: he was alienated and isolated by his coworkers; other coworkers mocked him for reporting the harassment, calling him a "crybaby" and asking if he was going to report them to HR; he was given more difficult and complicated work in an effort to make him look bad; his supervisor, McCullough, opposed his promotion; McCullough threatened to demote him after he was unable to complete a repair that other employees were similarly unable to complete; he was subject to unfair disciplinary actions and had to contact his union to get those actions reversed; and McCullough initiated an investigation into his work performance, ultimately culminating in his termination. This conduct, taken together, might dissuade a reasonable person from engaging in protected activity. Viewing the evidence in the light most favorable to Plaintiff, therefore, a reasonable jury could conclude that Plaintiff's list of allegedly retaliatory acts—considered as a whole—rise to the level of a materially adverse action. Therefore, for all of the foregoing reasons, the Court concludes that Plaintiff is entitled to have his retaliatory harassment claim tried by a jury.

## IV.    CONCLUSION

THE COURT THEREFORE ORDERS that Defendant's motion for summary judgment (Doc. 43) is GRANTED IN PART and DENIED IN PART as set forth in Part III, *supra*. Plaintiff's retaliation claim based on his termination and his retaliatory harassment claim survive for trial. Defendant is entitled to summary judgment on Plaintiff's other claims.

IT IS SO ORDERED.

Dated: December 18, 2019                    /s/  *Holly L. Teeter*
                                            HOLLY L. TEETER
                                            UNITED STATES DISTRICT JUDGE